James R. SCHNITZ,
Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 3-884A217.

Court of Appeals of Indiana,
Third District.

March 11, 1985.

F.E. Rakestraw, Brown, Rakestraw & Kehoe, Rochester, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Kenneth P. Williams, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

After a bench trial, the Fulton County Court found James R. Schnitz guilty of six counts of harassment. The court entered judgment against Schnitz and sentenced him to imprisonment for six consecutive terms of 180 days each. Schnitz appeals raising the issue of whether the evidence before the trial court was sufficient to support the convictions.

When reviewing the sufficiency of the evidence, we will consider only the evidence favorable to the judgment and all reasonable inferences which may be drawn from that evidence; we will not reweigh the evidence or judge the credibility of witnesses. *Garland v. State* (1983), Ind.App., 452 N.E.2d 1021. If there is substantial evidence of probative value on each element of the crime, we will affirm the conviction. *Peters v. State* (1983), Ind.App., 449 N.E.2d 311.

Two witnesses testified for the state: Susan Burke, a case worker for the Fulton County Welfare Department, and Schnitz's daughter. Their testimony revealed that in November 1979, when the daughter was thirteen, Burke investigated a complaint that Schnitz had sexually abused his daughter. That investigation led to Schnitz's first conviction for child molesting for which he spent three months in a V.A. hospital and three months in prison. Within months of Schnitz's release, the daughter informed Burke of another incident of sexual relations with her father. Again Schnitz was convicted of child molesting and was sentenced to a term of imprisonment at the Westville Correctional Center.

While at Westville, Schnitz wrote many letters to his daughter who was then residing in a foster home in Fulton County. Six of those letters, found by Burke under the daughter's bed at the foster home, constitute the basis for the charges against Schnitz. In the letters, Schnitz vividly described sexual activity in which he hoped to engage with his daughter after his release from Westville. In the letters, Schnitz enclosed pictures and articles from adult magazines and requested that his daughter send him erotic photographs of herself.

For each of the letters Schnitz was charged and convicted of the crime of harassment. Harassment is defined by statute as follows:

"Sec. 2. (a) A person who, with intent to harass, annoy, or alarm another person but with no intent of legitimate communication:

(1) makes a telephone call, whether or not a conversation ensues;

(2) communicates with a person anonymously or otherwise, by telegraph, mail, or other form of written communication; or

(3) transmits a false or obscene message, or indecent or profane words, on a Citizens Radio Service channel;

commits harassment, a Class B misdemeanor.

"(b) A message is obscene if:

(1) the average person, applying contemporary community standards, finds that the dominant theme of the message, taken as a whole, appeals to the prurient interest in sex;

(2) the message refers to sexual conduct in a patently offensive way; and

(3) the message, taken as a whole, lacks serious artistic, literary, political, or scientific value."

IC 35–45–2–2.

■ Each information charged Schnitz with a violation of Sec. 2(a)(2), communicating by mail with his daughter with the intent to harass, annoy or alarm her but with no intent of legitimate communication. Schnitz challenges his convictions arguing that there was not substantial evidence of probative value to prove that he sent the letters to his daughter "with intent to harass, annoy, or alarm" her. We are constrained to agree and therefore conclude that we must reverse.

We first note that we are not faced with the question of whether the content of Schnitz's letters was obscene under the statute. The definition of "obscene message" in paragraph (b) of the statute is applicable only to paragraph (a)(3) of the statute which criminalizes the transmission of obscene messages on a Citizens Radio Service channel.

■ Secondly, it is important to distinguish the repugnance of the letters written by Schnitz from the question of whether sending the letters violated the terms of the statute. Schnitz's attorney concedes the former point, that the subject matter of the letters was morally improper. He then crystallizes the distinction we must make.

"Certainly from the evidence one could conclude that [Schnitz] intended to arouse sexual desires in his daughter, and possibly that he intended to arrange for future sexual activity. However, the statute does not make the discussion of sexual material in private letters a crime. Nor does it make the intention to engage in improper sexual conduct in the future a crime."

Schnitz's brief at 10. The trial court similarly recognized the distinction prior to finding Schnitz guilty, stating "that we were not in this case judging the moral issues involved in these missives, only the intent of [Schnitz] in offering and sending them." Findings of the court, record at 153.

Our review of the evidence discloses no direct evidence that Schnitz harbored any intention to harass, annoy, or alarm his daughter. In the letters, Schnitz expressed his sexual desire for his daughter apparently hoping to arouse her desire for him. He described sexual fantasies which he evidently hoped to make real after his imprisonment ended. Far from trying to upset his daughter, Schnitz clearly wished to enhance the possibility he could continue to have sexual relations with her after his release from Westville.

We also find no evidence from which it reasonably can be inferred that Schnitz wrote the letters with intent to harass, annoy, or alarm his daughter. The dissent refers to the presumption that every sane person intends the natural and probable consequences of his action. We agree. But in the circumstances before us we are confronted with a series of letters written by a father to a daughter with whom he has had a continuing incestuous relationship. The tone of the letters, while highly sexual, does not itself indicate any purpose to harass, annoy, or alarm. During the period in question the daughter wrote to the defendant as many as twenty-five letters, and at least two or three of these contained some discussion of sexual matters. We may certainly presume from the letters that Schnitz desired to continue the incestuous relationship, but we are unable to presume his intent to annoy, etc.

The daughter did testify that the letters upset her, and if the evidence established that Schnitz sent the letters knowing this, the inference could be drawn to establish the intent required by the statute.

The evidence shows that Schnitz and his daughter corresponded for the period between October 1982 and April 1983. Introduced as a part of the six exhibits of letters which formed the basis of the charges were six envelopes addressed to the daughter bearing postmarks of December 21, 1982, February 4 and 28, 1983 and March 11, 15 and 26, 1983. Susan Burke testified that after she discovered the letters, she wrote to Schnitz and told him to stop writing such letters. The daughter received no more letters from her father thereafter.

The daughter was asked whether she had ever asked Schnitz not to write such letters. Her entire testimony on this subject was as follows:

"BY WILLIAM TULLEY-WELCH, ESQ. for the state

Q. Did you ever ask your father not to write letters like that to you?

A. I did once or twice.

Q. And what—did he continue to write letters to you?

A. Yes.

Q. I have no further questions, Your Honor.

THE COURT: Mr. Rakestraw?

CROSS EXAMINATION:

QUESTIONS BY FREDERICK E. RAKESTRAW, ESQ.

Q. Do you know when it was you asked him not to write to you?

A. No I don't.

Q. Was it after these letters were written or before these letters—

A. They were after a couple of them had been written.

Q. The letters you wrote to him were after, you say?

A. (Inaudible response)

Q. I believe that's all.

THE COURT: I believe her answer was after a couple had been written, I don't know if you heard that, Mr. Rakestraw.

MR. RAKESTRAW: No, I did not understand that.

THE COURT: Yes, that's what I heard. Why don't you ask her that question again.

Q. Yes, I would like to know when you asked him not to write to you again?

A. It had been after a couple of letters that he had wrote to me—written to me.

Q. Do you have any idea when that was?

A. No I don't.

Q. In any of your letters to him, did you have—did you discuss sexual matters?

A. In a couple of them, yes I did.

Q. Was this before or after you asked him not to write again?

A. This was before.

Q. And again, you have no way of knowing the dates and which of these letters are in what order or anything—

A. No I don't.

Q. But you had written him discussing sexual matters?

A. Yes I had.

Q. I believe that's all."

Schnitz elected to testify and responded in the negative when asked whether he wrote any letters to his daughter "after anyone asked him not to." The prosecutor asked him no questions. There was, thus, not even any evidence that Schnitz received the letters from his daughter.

Viewing the evidence in a light most favorable to the state, the daughter's testimony does support the conclusion she sent a letter requesting Schnitz to stop before she received some of the letters at issue here. However, there is no evidence Schnitz received her request and, even if there was such evidence, there is no evidence he sent another letter to her after receiving hers. Without that evidence, the trial court could not reasonably infer Schnitz had the intent required by the statute.

Schnitz's daughter was the victim of her father's letters just as she was the victim of his sexual relations with her. However, under Indiana law only the latter constitutes a crime. The harassment stat-

ute forbids a specific act, communication by mail, when it is accompanied by a specific intent, "to harass, annoy, or alarm another person but with no intent of legitimate communication." *See Kinney v. State* (1980), Ind.App., 404 N.E.2d 49. As revulsive as Schnitz's letters to his daughter are, we cannot sustain his convictions for harassment when the state has failed to prove Schnitz sent the letters with the specific intent required by statute.

Accordingly, we reverse and remand for entry of judgment of acquittal on all counts.

STATON, P.J., concurs.

HOFFMAN, J., dissents and files separate opinion.

HOFFMAN, Judge, dissenting.

I respectfully dissent.

The majority has properly stated this Court's standard of review and ignored its application to the facts. Stated concisely, upon review for sufficient evidence, this Court will look only to the evidence most favorable to the State *and all reasonable inferences to be drawn therefrom. Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260. It is not within the province of this Court to weigh conflicting evidence or to judge the credibility of witnesses. Furthermore, a conviction need not be substantiated through direct evidence, but may be sustained on the basis of circumstantial evidence alone. *Thomas v. State* (1983), Ind., 451 N.E.2d 651.

The majority reverses all six counts of conviction stating there is "no evidence from which it reasonably can be inferred that Schnitz intended to harass, annoy, or alarm his daughter." However, it is a universally accepted tenet of criminal law that every sane person is presumed to intend the natural and probable consequences of his own actions. Intent may be inferred from the voluntary commission of an act or from surrounding circumstances. *Morris v. State* (1979), 270 Ind. 245, 384 N.E.2d 1022; *In re Vincent* (1978), 268 Ind. 101,

374 N.E.2d 40; *Watson v. State* (1970), 255 Ind. 348, 264 N.E.2d 616.

I believe that substantial evidence of probative value supports all counts of conviction. The record indicates the defendant was convicted for sexually molesting his daughter in 1979 and 1981. The victim became a very disturbed young woman who required intensive psychological therapy. During his second period of incarceration, the defendant wrote six letters to his daughter which described in vivid detail his desire to commit incest with her. Some of the letters included graphic accounts of the defendant's sexual fantasies, while others contained extremely revealing photographs of naked men and women engaging in various sexual activities. The defendant asked his daughter to pose for photos wearing a bra and panties while assuming sexually provocative positions. Given the past relationship between the defendant and the victim, these letters do not indicate an attempt at legitimate communication.

Furthermore, I believe the majority ignores the victim's testimony in reaching its conclusion. The victim testified as follows:

"Q  Tammy, can you tell us when you received the letters that I showed you from your father, what kind of effect did that have on you?

"A  They upset me.

"Q  Did you ever ask your father not to write letters like that to you?

"A  I did once or twice.

"Q  and what—did he continue to write letters to you?

"A  Yes.

　　　*　　*　　*　　*　　*　　*

"Q  Do you know when it was you asked him not to write to you?

"A  No I don't.

"Q  Was it after these letters were written or before these letters—

"A  They were after a couple of them had been written."

This evidence indicates the defendant continued to send letters after the victim

asked him to stop. The majority, however, concludes:

"[T]here is no evidence Schnitz received her request and, even if there was such evidence, there is no evidence he sent another letter to her after receiving hers."[1]

By rejecting the explicit testimony of the victim in favor of defendant's testimony, the majority is improperly reweighing the evidence.

The trial court could reasonably infer the defendant's continued behavior indicated an intent to harass, annoy, or alarm the victim. The evidence is more than sufficient to prove beyond a reasonable doubt that the defendant intended to violate IND. CODE § 35–45–2–2(a)(2). I would affirm the judgment on all counts of conviction.

---

1. The majority concludes that the victim's request was communicated by mail. The evidence, however, does not indicate the form of her communication.