**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 23 2014, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RONALD J. MOORE**
Richmond, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JONATHAN GRAY, | ) | |
| Appellant-Defendant, | ) | |
| vs. | ) | No. 89A01-1309-CR-443 |
| STATE OF INDIANA, | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WAYNE SUPERIOR COURT
The Honorable Charles K. Todd, Jr., Judge
Cause No. 89D01-1203-MR-3

**October 23, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Jonathan R. Gray (Gray), appeals his conviction of felony murder, Ind. Code § 35-42-1-1(2); conspiracy to commit robbery resulting in serious bodily injury, a Class A felony, I.C. §§ 35-41-5-2(a), -42-5-1(1); and conspiracy to commit robbery while armed with a deadly weapon, a Class B felony, I.C. §§ 35-41-5-2(a), -42-5-1(1).

We affirm.

## ISSUES

Gray raises two issues on appeal, which we restate as the following three issues:

(1) Whether the State committed prosecutorial misconduct;

(2) Whether the trial court abused its discretion in sentencing Gray; and

(3) Whether the trial court violated Gray's Sixth Amendment right to a trial.

## FACTS AND PROCEDURAL HISTORY

On the afternoon of March 19, 2012, Gray and his four co-defendants—Robert Campbell (Campbell), Matthew Allen (Allen), David Lady, Jr. (Lady), and Montell Westfall (Westfall)—congregated at Gray's residence on Sheridan Street in Richmond, Indiana. Initially, the cohorts were tinkering with their motorized scooters, talking, and goofing off in the alley behind Gray's house. At some point however, Campbell began pacing up and down the alley as he exchanged a series of heated phone calls. When Campbell rejoined the group, he explained that his acquaintance, Michael Sekse (Sekse), would be coming over under the pretense that there was a large quantity of marijuana for

sale, stored in Gray's shed. As Campbell had previously sold marijuana to Sekse, he knew that Sekse would have a substantial sum of cash in his possession, and he requested that Gray, Allen, Lady, and Westfall assist him in robbing Sekse of his money. In exchange for their involvement, Campbell promised to give them $1,000 each. Gray and the three other co-defendants all agreed to participate. In preparation, Gray, Allen, and Westfall armed themselves with knives, and Lady equipped himself with a hatchet he found in Gray's shed.

As planned, when Sekse arrived, he followed Campbell and the others into the small, cluttered shed for the purpose of inspecting the marijuana. Once inside the shed, Sekse was ambushed. Gray and his co-defendants stabbed Sekse in the back, chest, and abdomen and cut the side of his head. As indicated by the stab wounds on his arms, Sekse struggled to fight off his attackers, but Campbell withdrew a handgun from his waistband and shot Sekse in the head. After falling to the ground, Sekse's labored breathing produced a "snoring" sound, which prompted Gray to repeatedly slit his throat. (Transcript p. 514). Campbell and Gray then dragged Sekse's body to the back of the shed and covered him with a plastic garden pond liner. Westfall and Lady grabbed Sekse's bundle of money and fled on foot to Lady's house—the designated meeting point. When Allen and Campbell arrived soon thereafter, Campbell counted and disbursed the cash. The robbery yielded approximately $11,000, of which Campbell awarded $1,000 each to Allen, Lady, and Westfall as promised. A short time later, Campbell and Gray crossed paths in the alley, where Campbell paid Gray his $1,000 share, keeping the remaining $7,000 for himself.

That evening, concerned that Sekse had not come home, Sekse's family commenced a search. Sekse's wife knew that he had made plans to meet Campbell and that he was carrying a large sum of money. After a family member detected Sekse's black pickup truck parked in a backyard on Sheridan Street, Sekse's wife drove over and knocked on Gray's door. Gray answered, but he denied knowing either Campbell or Sekse. Returning to the abandoned pickup truck, Sekse's wife observed that it had been ransacked, the windows were open, and the key was still in the ignition. Moreover, the paper towels that Sekse had used to wrap his money were scattered over the floorboards. Sekse's wife reported her husband's disappearance to the Richmond Police Department.

On March 20, 2012, after obtaining additional information from the neighbors, police officers secured a warrant to search Gray's shed, where they discovered Sekse's body, along with the discarded knives, hatchet, and shell casings that had been used in his murder. On March 28, 2012, the State filed an amended Information, charging Gray with Count I, felony murder, I.C. § 35-42-1-1(2); Count II, felony murder, I.C. §§ 35-41-2-4, -42-1-1(2); Count III, robbery, a Class A felony, I.C. § 35-42-5-1(1); Count IV, robbery, a Class A felony, I.C. §§ 35-41-2-4, -42-5-1(1); Count V, robbery, a Class B felony, I.C. § 35-42-5-1(1); Count VI, robbery, a Class B felony, I.C. §§ 35-41-2-4, -42-5-1(1); Count VII, conspiracy to commit robbery, a Class A felony, I.C. §§ 35-41-5-2(a), -42-5-1(1); Count VIII, conspiracy to commit robbery, a Class A felony, I.C. §§§ 35-41-2-4, -41-5-2(a), -42-5-1(1); Count IX, conspiracy to commit robbery, a Class B felony, I.C. §§ 35-41-

4

5-2(a), -42-5-1(1); Count X, aggravated battery, a Class B felony, I.C. § 35-42-2-1.5; and Count XI, assisting a criminal, a Class C felony, I.C. § 35-44-3-2(a)(2).[1]

On August 5, 2013, a four-day jury trial commenced. On August 8, 2013, at the close of the evidence, the jury returned a verdict of guilty as to all eleven Counts, and the trial court entered a judgment of conviction on the same. On September 6, 2013, the trial court conducted a sentencing hearing and vacated Gray's conviction as to Counts II, III, IV, V, VI, VIII, X, and XI. Thereafter, the trial court imposed a sentence of sixty years for Count I, felony murder; thirty years for Count VII, conspiracy to commit robbery resulting in serious bodily injury as a Class A felony; and ten years for Count IX, conspiracy to commit robbery while armed with a deadly weapon as a Class B felony. The trial court ordered that the sentences on Count VII and Count IX run concurrently, but consecutive to the sentence on Count I, resulting in an aggregate term of ninety years, executed in the Indiana Department of Correction.

Gray now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Prosecutorial Misconduct*

Gray claims that the State engaged in various acts of prosecutorial misconduct for which he is entitled to a retrial. In particular, Gray points to several remarks made by the prosecutor during his opening statement and closing argument, as well as to the prosecutor's repeated characterization of the matter as a "murder trial." (Appellant's Br.

---

[1] Indiana Code section 35-44-3-2 was repealed effective June 30, 2012. The crime of assisting a criminal is now codified at Indiana Code section 35-44.1-2-5.

p. 15).  When reviewing a claim of prosecutorial misconduct, our court must first decide whether the prosecutor's conduct was, in fact, improper.  *Stephens v. State*, 10 N.E.3d 599, 605 (Ind. Ct. App. 2014).  If we find that the prosecutor engaged in misconduct, our analysis turns on whether, under all of the circumstances, the misconduct "placed the defendant in a position of grave peril to which he or she would not have been subjected." *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006).  We look to case law and the Rules of Professional Conduct to assess whether a prosecutor's argument constitutes misconduct. *Id.*  Then, in determining whether the prosecutor's conduct placed the defendant in grave peril, we consider the probable persuasive effect of the misconduct on the verdict. *Stephens*, 10 N.E.3d at 605.

In order to preserve a claim of prosecutorial misconduct for appeal, a defendant must raise a contemporaneous objection *and* request an admonishment at the time the alleged misconduct occurs.  *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).  If the admonishment is insufficient to cure the error, or no admonishment is given, the defendant must then request a mistrial.  *Bass v. State*, 947 N.E.2d 456, 461 (Ind. Ct. App. 2011), *trans. denied*.  Here, Gray concedes that he did not make timely and specific objections to the challenged commentary, thereby waiving his claim for appeal.  However, even if a defendant procedurally defaults on a claim of prosecutorial misconduct, appellate review is not precluded if the misconduct constitutes fundamental error.  *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002).  In such cases, the defendant is required to establish not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error.  *Cooper*, 854 N.E.2d at 835.  Notwithstanding any waiver resulting from his failure

6

to object, Gray insists that he is entitled to a retrial because the State's misconduct amounted to fundamental error.

The fundamental error doctrine "is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Ryan*, 9 N.E.3d at 668 (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). To succeed on a claim of fundamental error, the defendant must establish that, under the circumstances, the trial court erred by not raising the issue *sua sponte* "because the alleged errors (a) 'constitute clearly blatant violations of basic and elementary principles of due process' and (b) 'present an undeniable and substantial potential for harm.'" *Id.* (quoting *Benson*, 762 N.E.2d at 756).

## A. *Opening Statement*

Gray claims that the prosecutor's opening statement contained improper commentary. Specifically, Gray directs our attention to the following remarks:

> Campbell needed help. He wasn't man enough to try to do this by himself, he had to enlist his little *henchmen* to get out there and assist him with this. And so there was some discussion between the five [co-defendants].
>
> \* \* \* \*
> Now, we're talking about five co-defendants who were all involved in this and as co-defendants go, you've got to take a close look at their testimony and I'm going to be the first one to get up here and tell you these guys are all essentially killers. *They're maybe not killers like you picture on TV, like everybody has this image of what a killer looks like, a John Wayne Gacy,*[2] or somebody that's all tattooed up and really muscular, but you know

[2] Notorious Chicago serial killer John Wayne Gacy, also known as the "Killer Clown," was executed by lethal injection on May 10, 1994, after he was convicted of murdering thirty-three young men between 1972 and 1978. *John Wayne Gacy: Murderer (1942-1994)*, BIOGRAPHY.COM, http://www.biography.com/people/john-wayne-gacy-10367544#synopsis (last visited Sept. 26, 2014).

what, in real life that's not necessarily what killers look like. *Killers look like [eighteen-year-old] kids and in this situation here the other co-defendants, . . . and this man, [Gray]*, again this happened with knives, again, Mike Sekse was unarmed, wasn't expecting it, nobody was fighting one on one, nobody could approach him individually and do this, but these guys had to collectively gang up on the guy inside of the shed and begin stabbing him. They stabbed—did—did anybody say, hey, just give us the money and we won't stab you? No, nobody even gave this poor guy a chance to say all right, take the money so I can save my life. They didn't give him that opportunity. *These little animals jumped on him like a bunch of piranhas*.

(Tr. pp. 293, 296 (emphases added)). Without citing to any Rule of Professional Conduct or supportive case law, Gray asserts that by referring to the co-defendants as Campbell's "henchmen"; "likening [Gray] to serial killers and television Hollywood killers"; and comparing the co-conspirators to piranhas, "the State improperly enflamed the passions of the jury." (Appellant's Br. p. 14). We disagree.

During a trial, a lawyer is prohibited from "assert[ing] personal knowledge of facts in issue except when testifying as a witness, or stat[ing] a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused." Ind. Professional Conduct Rule 3.4(e). However, our courts have previously declined to find misconduct where the prosecutor's "remarks were fair commentary on the facts introduced at trial." *Cooper*, 854 N.E.2d at 837. We find that the prosecutor's description of Gray and three of his co-defendants as "henchmen" in both his opening and closing statements is a fair characterization of the evidence, which clearly indicates that Campbell was the kingpin behind the conspiracy. A "henchman" is simply "a trusted follower or supporter who performs unpleasant, wrong, or illegal tasks for a powerful person (such as a politician or criminal)." MERRIAM-WEBSTER,

http://www.merriam-webster.com/dictionary/henchman (last visited Sept. 29, 2014). As the record demonstrates: Campbell arranged the sham marijuana transaction with Sekse and lured him to the shed; Campbell offered a financial incentive to his four co-defendants for their participation; Campbell concealed a handgun in his waistband while his helpers were armed with knives; Campbell fired the fatal gunshot; Westfall and Lady recovered the bundle of money, but they left it undisturbed for Campbell to count and distribute; and although he paid each co-conspirator only $1,000, Campbell retained more than $7,000 of the robbery proceeds. It is clear from this evidence that Gray, Allen, Lady, and Westfall were operating at Campbell's behest; therefore, we find no impropriety in the prosecutor's identification of their role as "henchmen." (Tr. p. 293).

In addition, we do not find the prosecutor's statements regarding "what killers look like" and the corresponding references to John Wayne Gacy and murderers depicted on television to constitute misconduct. (Tr. p. 296). While we do not generally condone the State's discussion of notorious serial killers in an opening statement, it is well established that the prosecutor may reasonably advocate to convince the jury of the defendant's guilt. In the case at bar, the prosecutor's reference did nothing to suggest that Gray or his cohorts were serial killers or any other "sinister connotation beyond the facts of the case." *Gann v. State*, 550 N.E.2d 73, 76 (Ind. 1990). Rather, we find that the prosecutor's comment was an effort to illustrate for the jury that even people who do not outwardly resemble the stereotypical images of a murderer are capable of committing horrific crimes. *See Brennan v. State*, 639 N.E.2d 649, 652 (Ind. 1994) (finding no misconduct in prosecutor's admonition to jury to "not let his professor-like looks deceive you, because he is a cold-

9

blooded killer"). Because the State's case relied, in part, upon the testimony of Allen, Lady, and Westfall—who were all minors at the time of the murder—it was reasonable for the prosecutor to prepare the jurors for the fact that they would be hearing gruesome evidence from very young co-defendants.

As to the prosecutor's description of Gray and the others as "animals" who attacked Sekse "like a bunch of piranhas[,]" we find no misconduct. (Tr. p. 296). It is the prerogative of the prosecuting attorney

> to argue the State's side of the case forcefully and to discuss the evidence pertinent thereto. We can perceive nothing unfair or prejudicial about permitting the prosecutor to argue his case in such a manner so long as his statements are reasonably calculated to sway the jury to the State's point of view in light of the evidence adduced at trial, and so long as he makes no deliberate distortions or improper comments.

*Morris v. State*, 384 N.E.2d 1022, 1025-26 (Ind. 1979). The evidence presented to the jury demonstrated that five young men—armed with knives and a handgun—lured an unarmed and unsuspecting individual into a shed under false pretenses and ambushed him, savagely murdering him for the sake of $1,000 (in the case of Gray, Allen, Lady, and Westfall). After killing Sekse and taking his money, Campbell and Gray callously dragged his body to a corner of the shed and concealed it with junk and other debris. The pathologist who conducted the autopsy testified that even if Sekse had not sustained the gunshot to the brain, the fourteen stab wounds, which included the four slits that Gray exacted on Sekse's throat, would nevertheless have resulted in death. Accordingly, we find that the prosecutor's attempt to sway the jury by analogizing the co-defendants' conduct to that of piranhas

10

(which are reputed to ferociously attack their prey in packs), though forceful, is neither unfair nor misleading. *See id.* at 1026.

### B. *Characterization of Matter as a "Murder Trial"*

Next, Gray claims that the prosecutor's "consistent use of the term murder" constituted misconduct. (Appellant's Br. p. 15). Specifically, Gray argues that he

> was not charged with murder. He stands convicted of felony murder for the death of Mike Sekse which occurred during a conspiracy to commit robbery as well as conspiracy to commit robbery . . . . The State's preview of the evidence here was as if this were a murder trial and the words used by the prosecutor were an attempt to get the jury thinking about this as a murder case and not as a felony murder and conspiracy case.

(Appellant's Br. p. 15). Gray does not cite any case law or other authority to support his position that his charges of "felony murder" are separate and distinct from the crime of "murder," such that the State's repeated references to "the day of the murder" warrant a retrial. (Appellant's Br. p. 17). Again, we disagree.

Contrary to Gray's unsubstantiated assertion, we find no legal distinction that precludes characterizing a felony murder as a murder. Felony murder is codified under the "Murder" section of the Indiana Code, which provides that "[a] person who . . . kills another human being while committing or attempting to commit . . . robbery . . . commits *murder*, a felony." I.C. § 35-42-1-1(2) (emphasis added). Although the elements to prove a murder that is committed in the course of another felony differ from those required to prove murder by a knowing or intentional killing, murder and felony murder are equal in rank. *See* I.C. § 35-42-1-1(1)-(2); *Hobson v. State*, 675 N.E.2d 1090, 1094 (Ind. 1996).

11

Gray's argument is even less persuasive in light of the remarks made by defense counsel during the trial. In the defense's opening statement, Gray's attorney stated that

> [felony murder is] the one instance when a person can actually be convicted of murder without having intended to kill someone. [It is] a controversial theory but it is the law in the State of Indiana. And the end result is the same. The conviction is the same if you choose to convict someone of felony murder as it would be to convict him of a murder. Same statute, different way of getting there.

(Tr. pp. 312-13). Then, during his closing argument, defense counsel again told the jury, "Don't be mistaken[,] [felony murder is] every bit as serious a charge, it's still called murder, the consequences are still the same, but to get there the State has a different set of facts that [it] [has] to prove." (Tr. p. 789). Furthermore, in addition to the fact that both the prosecutor and defense counsel repeatedly explained the concept of felony murder, the jury instructions also set forth Gray's charges for felony murder and clearly identified the elements that the State was required to prove in order for the jurors to convict. As such, we find no misconduct in the prosecutor's references to Sekse's murder, and because Gray has not established the grounds for prosecutorial misconduct in any of the prosecutor's other remarks, his claim of fundamental error must also fail.

## II. *Ninety-Year Sentence*

Gray claims that the trial court abused its sentencing discretion by ordering that he serve an executed term of ninety years. The trial court is vested with sound discretion in matters of sentencing. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*. On appeal, we will review sentencing decisions only for an abuse of that discretion. *Id.* We will find an abuse of discretion where the trial court's decision is "clearly against

12

the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.*

The trial court may impose any sentence authorized by statute. *Robertson v. State*, 871 N.E.2d 280, 283 (Ind. 2007). In making a sentencing determination, the trial court may consider any number of aggravating and mitigating factors. I.C. § 35-38-1-7.1. However, any aggravating and/or mitigating circumstances identified by the trial court must be supported by the record. *Anglemyer*, 868 N.E.2d at 490. In addition, in order to facilitate appellate review, trial courts are required to enter a sentencing statement that reasonably details the court's bases for imposing the specific sentence, including its findings, if any, of aggravating or mitigating circumstances. *Id.* It is well-settled that "[a] single aggravating circumstance is sufficient to justify a sentence enhancement." *Anderson v. State*, 961 N.E.2d 19, 33 (Ind. Ct. App. 2012), *trans. denied.* Moreover, the same valid aggravator may be used to enhance a sentence *and* to justify consecutive sentences. *Gleason v. State*, 965 N.E.2d 702, 712 (Ind. Ct. App. 2012).

In the present case, for conspiracy to commit robbery as a Class A felony and a Class B felony, the trial court sentenced Gray to the advisory terms of thirty years and ten years, respectively, running concurrently. I.C. §§ 35-50-2-4, -5. On the felony murder charge, the trial court ordered a consecutive, enhanced sentence of sixty years. I.C. § 35-50-2-3(a). In support of its decision, the trial court identified the following statutory and non-statutory aggravating circumstances: Gray's criminal history; his lack of remorse; the brutal nature of the offense; and Gray's overall dishonorable character, which includes his failure to establish paternity to a six-year-old daughter, his unresolved criminal matters in

13

Oklahoma; his habitual drug use, and an absence of gainful employment in his work history. The trial court explicitly rejected all of the mitigating factors proffered by Gray.

Gray now asserts that the trial court abused its discretion by failing to recognize that his criminal history consists only of non-violent misdemeanors "and that approximately four years had elapsed between [his] offenses in Oklahoma and this matter." (Appellant's Br. p. 22). Gray further argues that his non-violent misdemeanor history warrants only concurrent, advisory sentences, thereby reducing his ninety-year sentence to fifty-five years. We disagree.

The trial court specifically found, and the record supports, that Gray's criminal record consists of three misdemeanor convictions and multiple other arrests. The trial court acknowledged that Gray's criminal history

> is clearly not the most egregious record that the [c]ourt's seen, but it's also not something to be dismissive about and it is clearly an aggravator in this cause, especially given [Gray's] young age—relatively young age. [Gray] has received previously suspended sentences and also received previous time to serve, neither of which appear to deter [Gray] from committing criminal activity which has brought us here today.

(Tr. p. 926). The trial court found it further significant that two of Gray's misdemeanor convictions—one for obtaining cash and merchandise by means of a bogus check and the other for a felony burglary that was ultimately pled down to misdemeanor breaking and entering—involved victims. Standing alone, the fact that an individual "has a history of criminal or delinquent behavior" is sufficient to constitute an aggravating circumstance. I.C. § 35-38-1-7.1(a)(2). We are unpersuaded by Gray's contentions that the trial court did not accord sufficient consideration to certain facets of his criminal record because the trial

14

court has no obligation to weigh aggravating or mitigating factors. *Kimbrough v. State*, 979 N.E.2d 625, 629 (Ind. 2012). Additionally, despite the fact that a trial court is not required to accept a defendant's arguments regarding mitigating circumstances, we nevertheless note that Gray's allusion to a four-year gap in his criminal activity, which might favor a mitigated sentence, is wholly unsupported by the record. *See* I.C. § 35-38-1-7.1(b)(6); *Williams v. State*, 997 N.E.2d 1154, 1163 (Ind. Ct. App. 2013). In fact, Gray continues to have unresolved criminal matters in at least two Oklahoma counties, including an outstanding warrant for failing to appear in a pending misdemeanor case.

Gray also argues that the trial court erroneously considered the Indiana Risk Assessment System (IRAS), included in his pre-sentence investigation (PSI) report, as an aggravating circumstance. During the sentencing hearing, the trial court noted the results of the IRAS, which identified Gray as very likely to reoffend, but specifically clarified that it did not consider it as an aggravating factor. However, the trial court subsequently stated that the IRAS "supports what [it] believe[s] to be the character of [Gray] and his likelihood for committing future criminal acts." (Tr. p. 932). "Evidence-based offender assessment scores are not to be considered aggravating or mitigating factors or determine the gross length of a sentence." *Williams*, 997 N.E.2d at 1165. Thus, if the trial court did, in fact, rely on the IRAS as a separate aggravating factor, it would be inappropriate. *Id.* Notwithstanding the IRAS, we find that the trial court cited ample other uncontested evidence to support finding Gray's character to be an aggravating circumstance, including Gray's long-term drug use; his proclivity for criminal associations and activity; and his habitual refusal to take responsibility for his obligations, as evidenced by his unresolved

criminal matters, his refusal to establish paternity for a six-year-old child, and his mere twelve-months of legitimate employment in the course of his lifetime.

Gray also posits that "[i]t seems disingenuous to aggravate a sentence for the nature of the offense by considering the planning, [Gray's] role in the plan, and the post-offense cover up when those are the specific offenses for which the jury found him guilty." (Appellant's Br. pp. 24-25). We recognize that a material element of a crime may not serve as an aggravating circumstance; however, "the nature and circumstances of the crime can be an aggravator" so long as the trial court identifies "facts that go beyond the statutory requirements of the crime." *Gleason*, 965 N.E.2d at 711. We find that the trial court properly decided that Gray's conduct exceeded the statutory elements of felony murder or conspiracy to commit robbery. In particular, the trial court found Gray's culpability in the conspiracy to be significant, noting that Gray provided knives to his co-defendants, took "an active role in stabbing [Sekse,]" and that he and Campbell were "primarily responsible for covering up the gruesome death." (Tr. p. 935). Therefore, because the trial court imposed sentences within the statutory regime and identified at least one valid aggravating circumstance, we find no abuse of discretion in the trial court's decision to enhance the felony murder sentence or to order the sentences for felony murder and conspiracy to run consecutively.[3]

III. *Sixth Amendment Violation*

---

[3] Although Gray contends that the trial court abused its discretion by imposing an "inappropriate" sentence and cites to Indiana Appellate Rule 7(B), he does not develop this argument any further. *See* Ind. Appellate Rule 46(A)(8)(a). Because Gray has failed to tender *any* argument as to why the nature of his offense and his character merit revision, we decline to disrupt the trial court's sentence.

16

Lastly, Gray claims that the trial court violated his Sixth Amendment right to a trial by considering Gray's outstanding warrant on a pending misdemeanor, as well as a second warrant based on an alleged probation violation, in its sentencing decision. Indiana Code section 35-38-1-7.1(a)(6) provides that a trial court may consider an individual's recent violation of "the conditions of any probation, parole, pardon, community corrections placement, or pretrial release" as an aggravating circumstance. During the sentencing hearing, the trial court expressed that it was considering Gray's pending Oklahoma warrants as part of his overall criminal history or as to the fact that he has not led a law-abiding life; however, in its subsequent sentencing order, the trial court identified the outstanding Oklahoma warrants as an aggravating factor under Indiana Code section 35-38-1-7.1(a)(6).

The United States Supreme Court has determined that, with the exception of prior convictions, any fact that a trial court relies upon to enhance a sentence must have either been found by a jury beyond a reasonable doubt, admitted to by the defendant, or found by the sentencing judge after the defendant has waived *Apprendi* rights and consented to judicial fact-finding. *Robertson*, 871 N.E.2d at 286 (citing *Blakely v. Washington*, 542 U.S. 296, 302 (2004)). To rely upon facts that have not been properly determined by judge or jury or admitted to by the defendant would infringe upon the defendant's Sixth Amendment right to trial by jury. *Edrington v. State*, 909 N.E.2d 1093, 1099 (Ind. Ct. App. 2009), *trans. denied*. Here, neither Gray's pending misdemeanor and failure to appear nor his alleged probation violation have been adjudicated or conceded to by Gray. Nonetheless, our supreme court has determined that a probation violation, even if not found

17

by a jury or admitted by the defendant, may serve as a proper basis for sentence enhancement if "the probation violation was reported in a presentence investigation report compiled by a probation officer *relying upon judicial records*." *Robertson*, 871 N.E.2d at 287. During the sentencing hearing, the probation officer who compiled Gray's PSI report testified that she included the pending Oklahoma matters in the report in reliance upon chronological case summaries, which she obtained directly from the Oklahoma jurisdictions holding the outstanding warrants. Therefore, we find that the trial court did not violate Gray's Sixth Amendment rights to the extent, if any, that it considered Gray's pending warrants for failing to appear and violating his probation to be an aggravating circumstance.

## CONCLUSION

Based on the foregoing, we conclude that Gray is not entitled to a retrial because the prosecutor's remarks do not amount to misconduct. Additionally, we conclude that the trial court did not abuse its discretion in imposing a ninety-year sentence, and the trial court did not violate Gray's Sixth Amendment right to a jury trial by considering his outstanding warrants as aggravating factors to merit a sentence enhancement.

Affirmed.

ROBB, J. and BRADFORD, J. concur

18